UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                        )
JAMES J. MURRAY,        )
        Plaintiff,      )
                        )
v.                      )       Civil Docket No. 05-11844-WGY
                        )
UNITED STATES OF AMERICA,)
        Defendant.      )
_____)
```

**DEFENDANT'S MEMORANDUM IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

The defendant[1] in above-captioned matter respectfully
requests that this Court grant summary judgment in the
defendant's favor.

**MATERIAL FACTS OF RECORD**

On April 25, 1994, the plaintiff, James Murray, was
sentenced in the United States District Court for the District of
Massachusetts to a term of imprisonment of twelve years and six
months with sixty months of supervised release to follow for the

---

[1] The plaintiff originally named "United States of America
and Harley G. Lappin, as he is Director, Federal Bureau of
Prisons, and Michael J. Sullivan, as he is United States Attorney
for the District of Massachusetts" as the defendants in this
case.  On January 19, 2006, the defendants filed a motion to
dismiss or, in the alternative, for summary judgment.  Docket
Entry 6.  In the motion, the defendants argued in part that the
United States of America is the only proper party defendant in a
civil action filed under the Federal Tort Claims Act.  Docket
Entry 7, pp. 5-6.  In the plaintiff's opposition to the motion,
the plaintiff agreed "that the action is a suit against the
United States and is not brought personally against the Director
of the Bureau of Prisons, or the United States Attorney for the
District of Massachusetts, both of whom were named only for the
purposes of directing service of process to the proper
authorities, and/or agencies."  Docket Entry 9, p. 11.

offense of conspiracy to possess with intent to distribute and attempt to possess with intent to distribute marijuana, a violation of 21 U.S.C. § 846, and possession of marijuana with intent to distribute, a violation of 21 U.S.C. § 841(a)(1). Docket Entry 7, pp. 1-2. The plaintiff was incarcerated at the Federal Medical Center ("FMC") Devens, Massachusetts from October 28, 1998 through May 24, 2004. Id. at Document 1b. On May 24, 2004, he was furloughed to an unescorted transfer to a Community Corrections Center. Id. On November 17, 2004, he was released via Good Conduct Time available to him under 18 U.S.C. § 3624(b). Id.

On June 29, 2002, the plaintiff wrote a letter to FMC Devens employee Joanne Roseman regarding the plaintiff's medical condition and treatment.[2]

On July 29, 2002, the plaintiff wrote a letter to Dr. Yelin at the D'Ambrosio Eye Clinic regarding his medical treatment.[3]

On Wednesday, September 18, 2002, the plaintiff wrote a letter to FMC Devens employee Edward Motley regarding the plaintiff's medical condition and included a pamphlet on glaucoma given to him at the D'Ambrosio Eye Clinic.[4]

On October 4, 2002, the plaintiff wrote a letter to FMC

---

[2] This letter is attached as Exhibit 1.

[3] This letter is attached as Exhibit 2

[4] This letter is attached as Exhibit 3.

2

Devens employee Edward Motley regarding the plaintiff's medical condition.[5]

On November 23, 2004, the plaintiff's attorney submitted an administrative tort claim on behalf of the plaintiff to the Bureau of Prison's Northeast Regional Counsel's Office.  Id. at Document 1c.  In the tort claim, the plaintiff alleged that in May of 2001, he began to experience vision problems with his right eye.  Id.  The plaintiff alleges that he received inadequate medical care over a period of years which has caused him to have three surgical procedures.  Id.  As a result of the defendants' negligence, the plaintiff contends he has lost vision in his right eye.  As relief, he requested $1,500,000.00 representing damages for personal injury.  Id.

Apparently in response to a number of letters written by the plaintiff to the doctors at the D'Ambrosio Eye Clinic, on Decenber 24, 2004, Farncis A. D'Ambrosio, Jr., M.D., wrote a letter to plaintiff's counsel summarizing the treatment provided by the D'Ambrosio Eye Clinic to the plaintiff.[6]

On January 26, 2005, the Northeast Regional Counsel sent the plaintiff's attorney a letter acknowledging receipt of his administrative tort claim.  Id. at Document 1d.  In a memorandum dated April 12, 2005, Henry J. Sadowski, Northeast Regional

---

[5] This letter is attached as Exhibit 4.

[6] This letter is attached as Exhibit 5.

Counsel, denied the plaintiff's tort claim.  Id. at Document 1e.
Mr. Sadowski advised the plaintiff that, if he was dissatisfied
with the decision, he could bring an action against the United
States in an appropriate United States District Court within six
months of the date of the letter.  Id.

On September 12, 2005, the plaintiff filed the instant civil
action alleging claims pursuant to Federal Tort Claims Act
("FTCA"), 28 U.S.C. §2670, et. seq.  Compl. ¶ 2.  The plaintiff
claims that as a direct and proximate result of the negligent
acts of the defendant, he has suffered permanent damage to his
optic nerve, loss of vision in his right eye, endured pain and
suffering, and has been in poor health.  Id. at ¶¶ 23, 24.  As
relief, the plaintiff requests damages and costs.  Id. at ¶ 24.

On January 19, 2006, the defendant filed a motion to dismiss
or, in the alternative, for summary judgment along with a
memorandum in support of said motion.  Docket Entries 6 and 7,
respectively.  In the memorandum, the defendant argued that, to
the extent that the plaintiff seeks damages for negligent medical
treatment rendered prior to November 23, 2002, these claims are
barred by the applicable statute of limitations where the
plaintiff's administrative tort claim was filed on November 23,
2004.  Docket Entry 7, pp. 6-8.  In addition, the defendant
argued that, to the extent that the plaintiff alleges his damages
were caused by the negligence of a physician who is not an

4

employee of the United States, the complaint should be dismissed because the government is not liable for the alleged negligence of a non-governmental medical practitioner.  <u>Id</u>. at 8-13. Finally, the defendant argued that, while the plaintiff was at FMC Devens he received appropriate medical care and that the defendant was not aware of any medical opinion to the contrary. <u>Id</u>. at 13-14.

In opposition to the defendant's motion, the plaintiff made the following arguments to the contrary: the plaintiff was not aware of permanent loss to his vision until he was so informed by Dr. Howard on January 7, 2003 (Docket Entry 9, p. 10); the plaintiff does not allege that any of the independent contractors at the D'Ambrosio Eye Care Center were negligent, rather the plaintiff alleges only the staff at FMC Devens were negligent (<u>id</u>.); and, in support of his allegations of negligence, the plaintiff submitted the affidavit of A. Joseph Ruddick, Jr., M.D. (<u>id</u>. at 17-19).

Based on the statements set forth in the plaintiff's opposition, the Court determined that the plaintiff's administrative claim was filed within the FTCA limitations period where the defendant claimed he was not aware of permanent loss to his vision until he was so informed by Dr. Howard on January 7, 2003.  Consequently, the Court denied the defendants' motion.

**ARGUMENT**

**I.   The plaintiff's claims for medical negligence are limited to those allegations set forth in the affidavit of Dr. Rudick.**

Under Massachusetts law, a plaintiff in a medical malpractice suit bears the burden of proving by a preponderance of the evidence that a physician-patient relationship existed between the physician and the injured party, that the physician breached his or her duty of care, and that the breach was a proximate cause of some injury.  Mitchell v. United States, 141 F.3d 8, 13 (1st Cir. 1998).  A physician is held to the standard of care of the average practitioner of the medical specialty in question.  Id. at 13.  A plaintiff in a medical malpractice action must establish a causal connection between a defendant's alleged negligence and ensuing injuries.  Rosario v. United States, 824 F. Supp. 268, 287 (D. Mass. 1993).  Generally, a plaintiff in a medical malpractice case may carry his burden of proof on issues of negligence and causation only with the assistance of expert testimony.  Mitchell, 141 F.3d at 13.

The defendant's original motion contained an affidavit from Sandra L. Howard, M.D., that indicates that while the plaintiff was at FMC Devens he received appropriate medical care.  Docket Entry 7, Document 2.  In his opposition, the plaintiff submitted an affidavit of A. Joseph Ruddick, Jr., M.D. which provided expert testimony supporting the plaintiff's allegations of negligence.  Consequently, the plaintiff's allegations of

6

negligence are limited to those allegations set forth in the
affidavit of Dr. Ruddick.

In his affidavit, Dr. Ruddick came to the following
conclusions regarding the medical treatment received by the
plaintiff from the staff at FMC Devens:

> In summary, Mr. Murray had pseduoexfoliation glaucoma
> that was not diagnosed in a timely fashion.  His
> initial visual complaints were in May 2001 yet he did
> not have his IOP checked until September 24, 2001.
> While he was given timoptic his IOP was not evaluated
> until November 13, 2001, a further delay.  When the IOP
> was measured, it was found to be elevated to 34.  While
> surgery was recommended immediately, it was not
> performed for two months.  While the patient had an
> immediate post laser IOP of 13, a re-evaluation was not
> performed again until July 2002, when IOP of 38 was
> noted.  It is within a reasonable degree of medical
> certainty that these continued delays in evaluation and
> treatment were the cause of Mr. Murray's subsequent
> optic nerve damage.  Such delays are a deviation from
> the standard of medical care.  In addition, it is a
> deviation from the standard of medical care not to
> monitor a patient with advanced glaucoma with repeated
> visual fields in addition to IOP examinations.  Mr.
> Murray did not have serial visual fields.  These delays
> within a reasonable degree of medical certainty lead to
> the damage that Mr. Murray suffered in his optic nerve.
> This damage is permanent.

Docket Entry 10, p. 19.

Accordingly, the plaintiff's claims of negligence are
limited to those specific instances set forth in the above
summary that alleges negligent acts which occurred between May
2001 through July 2002.

II. **Based on the plaintiff's own admissions, he was aware of his alleged permanent injury to his optic nerve and the alleged negligence that caused it by September 18, 2002.**

The defendant argued in its original motion that because the allegations of negligence took place more than two years before the plaintiff filed his administrative claim on November 23, 2004, the claims are statutorily barred under the FTCA, 28 U.S.C. § 2401(b). Docket Entry 7, pp. 6-8.

In response, the plaintiff argued that he was not aware of the permanent damage to his optic-nerve until he was so informed by Dr. Howard on January 7, 2003. Docket Entry 9, p. 10. Based on this claim, the Court determined that the plaintiff's claims of negligence were within the statute of limitations since the plaintiff filed his administrative claim on November 23, 2004. This statement, however, is in direct contradiction to the admissions made by the plaintiff in his letters written during his incarceration. These letters, coincidently, contain the same time periods and allegations of negligence as set forth in Dr. Rudick's affidavit.

For example, on June 29, 2002, the plaintiff wrote a letter to FMC Devens employee Joanne Roseman regarding the plaintiff's medical condition and treatment. See Exhibit 1. This letter contained the following excerpt:

> As I have informed you through the cop-out process previously, as well as during our February 5th, 2002 conversation Ms. Roseman, I have been told by the D'Ambrosio Eye Clinic that because of the advanced

8

glaucoma in my right eye, *I now have permanent damage
to that eye's optic nerve* which has resulted in a great
deal of vision loss to my right eye.  Exhibit 1, p. 2
(emphasis added).

On July 29, 2002, the plaintiff wrote a letter to Dr. Yelin

at the D'Ambrosio Eye Clinic regarding his medical treatment.

See Exhibit 2.  In this letter he specifically alleged negligence

on behalf of the FMC Devens medical staff resulting in damage to

his optic-nerve: "As, I do not wish for *any further damage* to

occur to my right eye's optic-nerve due to any time delay, than

has already occurred thusfar Dr. Mahar *as a result of the*

*negligence of the F.M.C. Devens Health Services Department and*

*its pharmacy*."  Exhibit 2, p. 2 (emphasis added).[7]

_____

[7] According to Francis D'Ambrosio, Jr., M.D., the plaintiff
wrote a number of letters to the doctors at the D'Ambrosio Eye
Clinic.  Exhibit 5, p. 4.  Apparently, Dr. D'Ambrosio eventually
felt that a response was necessary.  In the response letter Dr.
D'Ambrosio wrote, in part, the following:

There was a note in our telephone note section in his
record that I know you are aware of.  This note was on
October 17, 2002 at 10:40 a.m.  At that time, the
physician's assistant from Devens called and spoke to
one of my technicians.  They thought that there was a
lapse of nine months before Mr. Murray was seen in our
office which they felt should have been avoided.  From
the time that we saw Mr. Murray on November 13, 2001
until January 29, 2003, all of his visits were kept
except for extenuating circumstances, and at no time in
the office did he state that he was not getting his
drops.  He had sent several long, detailed, letters to
two of the physicians in my office with some complaint
of not receiving his drops on time.  We addressed those
issues and they were quickly, by his own admission,
corrected.  Again, however, these were of short
duration and in my professional estimation, did not in

On Wednesday, September 18, 2002, the plaintiff wrote a letter to FMC Devens employee Edward Motley regarding the plaintiff's medical condition and included a pamphlet on glaucoma given to him at the D'Ambrosio Eye Clinic.  See Exhibit 3.  This letter contained a detailed description of the plaintiff's allegations of negligence which were identical to the allegations set forth in Dr. Rudick's affidavit.  This letter contained the following excerpts:

> I have the eye disease which is known as glaucoma. Briefly sir, glaucoma is caused by an increase of the pressure within one's eyes. ***This increase in eye pressure, then damages the eye's optic-nerve (which is permanent & cannot be repaired).***  With each day that passes in which the eye pressure is elevated Mr. Motley, a person with glaucoma (such as myself) loses more and more of their eyesight forever.  Exhibit 3, p. 1 (emphasis added).

> I have already lost a great deal of the eyesight in my right eye unnecessarily . . . I do not wish to suffer ***any more permanent damage.***  Id. at 7 (emphasis added).

On October 4, 2002, the plaintiff wrote a letter to FMC Devens employee Edward Motley regarding the plaintiff's medical condition.  See Exhibit 4.  This letter contained the following excerpt:

> I was informed by the doctor that the eye pressure within my right eye (for which the alphagan P eye medication had been prescribed for) had elevated to a very dangerous level.  Thus, ***causing even further permanent damage to my right eye's optic nerve.*** Exhibit 4, p. 2 (emphasis added).

any way adversely affect the outcome of his glaucoma. Exhibit 5, pp. 3-4.

10

Based on the plaintiff's own admissions, he was aware of his alleged permanent injury to his optic nerve and the alleged negligence that caused it at least on or before September 18, 2002. Consequently, the plaintiff's administrative claim for these alleged negligent acts was due no later than September 18, 2004. See 28 U.S.C. § 2401(b).[8] The plaintiff, however, did not file his administrative claim until November 23, 2004.

**III. This Court lacks subject matter jurisdiction where the plaintiff failed to file his administrative tort claim within two years of the alleged negligent acts.**

It is well settled that limitation periods in statutes waiving sovereign immunity are jurisdictional, and courts exercising their equitable authority may not expand its jurisdiction beyond the limits established by Congress. Ramming v. United States, 281 F.3d 158 (5th Cir. 2001); Houston v. United States Postal Service, 823 F.2d 896, 898, 902 (5th Cir. 1987). When construing the statute of limitations which is a condition of the FTCA's waiver of sovereign immunity, the Court should not take it upon itself to extend that waiver beyond that which Congress intended. United States v. Kubrick, 444 U.S. 111, 118 (1979); Roman v. Townsend, 224 F.3d 24, 28 (1st Cir. 2000).

Therefore, because the plaintiff failed to file his

---

[8] Title 28 U.S.C. § 2401(b) requires that any tort claim against the United States be "presented in writing to the appropriate federal agency within two years after such claim accrues."

administrative tort claim prior to October 4, 2004, this civil action must be dismissed as this Court lacks jurisdiction to hear said claims.

## CONCLUSION

For all of the aforementioned reasons, the defendant respectfully suggests that summary judgment be granted in the defendant's favor.

Respectfully submitted,

UNITED STATES OF AMERICA
By its attorney,

MICHAEL J. SULLIVAN
United States Attorney

Dated: October 12, 2006  By:  /S/ Christopher R. Donato
Christopher R. Donato
Assistant U.S. Attorney
U.S. Attorney's Office
John Joseph Moakley Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3303

## CERTIFICATE OF SERVICE

I hereby certify that the above document was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

Dated: October 12, 2006          /S/ Christopher R. Donato
Christopher R. Donato
Assistant U.S. Attorney

12

# Exhibit 1

BP-S148.055 **INMATE REQUEST TO STAFF** CDFRM
SEP 98
**U.S. DEPARTMENT OF JUSTICE**                        **FEDERAL BUREAU OF PRISONS**

| TO:(Name and Title of Staff Member) | DATE: |
| Ms. Joanne Roseman / Health Serv. Admin | June 29TH, 2002 |
| FROM: James J. Murray | REGISTER NO.: 56285-079 |
| WORK ASSIGNMENT: I-Unit Orderly | UNIT: **CAMP** |

SUBJECT: (Briefly state your question or concern and the solution you are requesting.
Continue on back, if necessary.  Your failure to be specific may result in no action being
taken.  If necessary, you will be interviewed in order to successfully respond to your
request.)

 Dear Ms. Roseman, I Am Sending This Cop-Out To You Today, As A Follow-Up To A Previous Cop-Out I Had Sent To You 1 Month Ago (On May 29TH, 2002) Which Was Never Answered.

 Briefly Ms. Roseman, I Had Glaucoma Surgery Performed On My Right Eye, On January 15TH, 2002 At The D'Ambrosio Eye Clinic In The Leominster Hospital.

 2 Weeks Later, (On January 29TH, 2002) I Was Taken Back To The D'Ambrosio Eye Clinic For A Re-Examination By One of Their Ophthalmologists (Dr. Yelin). At This Time, I Was Advised As To: 2 More Follow-Up Examinations I Needed To Have.

(Do not write below this line)          (Over Please)→

DISPOSITION:
7/8/02

 you are scheduled to see the ophthalmologist for follow-up.

| Signature Staff Member | Date |
| Roberto Betances, Acting AHSA | 7/8/02 |

Record Copy - File; Copy - Inmate
(This form may be replicated via WP)

This form replaces BP-148.070 dated Oct 86
and BP-S148.070 APR 94

US0650

No #1 Ms. Kaseman, Is: My Eyes Were Supposed To Be Re-Examined Here At F.M.C. Devens By The Visiting Optometrist Within 90 Days After My Appointment Of January 29th, 2002 At The D'Ambrosio Eye Clinic. (By Appx. April 29th, 2002).

No #2 Ms. Roseman, Is: My Eyes Are Supposed To Be Re-Examined Back At The D'Ambrosio Eye Clinic By An Opthalmologist Within 6 Months After My January 29th, 2002 Eye Surgery Follow-Up Appointment. (By Appx. July 29th, 2002).

As I Have Informed You Through The Cop-Out Process Previously, As Well As During Our February 5th, 2002 Conversation Ms. Roseman, I Have Been Told By The D'Ambrosio Eye Clinic That Because Of The Advanced Glaucoma In My Right Eye, I Now Have Permanent Damage To That Eye's Optic Nerve. Which, Has Resulted In A Great Deal Of Vision Loss To My Right Eye.

Additionally Ms. Roseman, As I Have Informed You Through The Cop-Out Process Previously, As Well As During Our February 5th, 2002 Conversation, I Have Been Told By The D'Ambrosio Eye Clinic That I Also Have Glaucoma In My Left Eye As Well.

The Purpose Of My Cop-Out To You Today Ms. Roseman, Is To Once Again Ask For Your Help In Assisting Me With My Recommended Eye Re-Examination Follow-Up Appointments Which Are Of Most Importance For Me.

It Is Imperative That Both Of My Eyes Be Checked Ms. Roseman. In Particular, My Eyes Pressure, In Order To Hopefully Avoid Any Further Optic-Nerve Damage To Either Eye.

I Currently Have Approximately 28½ More Months Remaining To Serve On My Sentence Ms. Roseman. And, I Do Not Wish To Suffer The Same Damage To My Left Eye, As I Have Suffered To My Right Eye. Thus, Risking Total Blindness. Can You Please Help Me Ms. Roseman, By Your Assuring That My Eye Re-Examination Appointments Are Scheduled?

Thank You For Your Consideration In This Matter.

Sincerely, James J. Murray

US0651

# Exhibit 2

Dr. Yelin
The D'Ambrosio Eye Clinic
Leominster Hospital
Professional Suite #2
100 Hospital Road
Leominster, MA. 01453

James J. Murray
Reg. #56285-079
F.M.C. Devens Camp
P.O. Box 879
Ayer, MA. 01432

Dear Dr. Yelin:                                    Monday, July 29th, 2002

I Am Respectfully Writing This Letter To You Today, In Order To Thank You For Your Assistance.

On Monday, July 15th, 2002 I Was Driven From The F.M.C. Devens Camp To The D'Ambrosio Eye Clinic In Order To Undergo My 6 Month Post Surgical Eye Re-Examination. (Which,You Had Recommended For Me During My Eye Examination With You On 1/29/02).

I Would Like To Take This Opportunity Today Dr. Yelin, To Say Thank You Very Much For Your Help In Assuring That I Would Be Taken Back To The D'Ambrosio Eye Clinic For My 6 Month Eye Re-Examination. (Which, Was Conducted By Dr. Mahar).

Unfortunately Dr. Yelin, I Never Received The Interum 90 Day Post Surgical Eye Re-Examination You Had Also Recommended For Me On 1/29/02 By The F.M.C. Devens Health Services Department. (Even After I Had Informed Them, And Made Numerous Requests To Them For A Re-Examination of My Eyes By Appx. April 29th, 2002).

Whenever I Was Informed During My 7/15/02 Eye Re-Examination With Dr. Mahar That The Pressure In My Right Eye Had Risen Back Into The 30's, I Was Heartbroken.

I Immediately Thought To Myself: If Only Dr. Yelins 1st Recommendation Had Been Followed And My Eyes Had Been Re-Examined By The F.M.C. Devens Health Services Department Within 90 Days of 1/29/02 (By, Appx. April 29th, 2002) This Rise In The Pressure of My Right Eye Could Have Been Detected Earlier. Thus, Preventing Any Further Permanent Damage To My Right Eyes Optic-Nerve. And, I Was Quite Saddened By This Dr. Yelin As I Mentioned Earlier.

Dr. Mahar Then Prescribed For Me A 2nd Type of Eyedrop Medication By The Name of: Latanoprost Ophthalmic Solution 0.005% ML. Dr. Mahar Instructed Me To Instill 1 Drop, (In My Right Eye Only) Every Evening At Bedtime. Dr. Mahar Then Informed Me That He Would Re-Schedule Me For Another Eye Examination In The Near Future At The D'Ambrosio Eye Clinic. (In Order To Monitor The Results of My New Eye Medication). And Also, That The Possibility Of A 2nd Laser Eye Surgery Procedure For My Right Eye May Very Well Be On The Horizion.

Upon My Returning To The F.M.C. Devens Camp On 7/15/02 Dr. Yelin, I Reported That Evening At 9:00 p.m. To The F.M.C. Devens Camp "Pill Line". (During Which, Our Prescription Medications Are Dispensed To Us From The F.M.C. Devens Pharmacy). At This Time, I Was Told That They Didn't Have Any Medication For Me.

Night After Night, I Was Continually Told By The Various "Pill Line" Attendants That "They Did Not Have Any Prescription Eyedrops For Me". And, To "Try Back Again Tomorrow Evening". After 1 Full Week Had Passed By Without My Receiving My New Prescription Eye Medication, I Sent A Letter To Dr. Mahar On 7/22/02 In Order To Apprise Him of My Failure To Receive This Important Medication.

Subsequently Dr. Yelin, After My Reporting To The F.M.C. Devens Camp "Pill Line" For 12 Consecutive Evenings, Thanks To Dr. Mahars Intervening On My Behalf, I Finally Received My Eyedrops On The Evening of Friday, July 26th, 2002. Therefore, At This Time, I Would Like To Make The D'Ambrosio Eye Clinic Aware That I Began Administering My New Eyedrop Medication On That Very Same Evening. (of: 7/26/02).

In Closing, I Would Like To Thank You Once Again For Your Help And Attention In This Matter Dr. Yelin, As I Am Trying To Save The Remaining Eye Sight I Have In My Right Eye From Any Unnecessary Further Damage.

D'Ambrosio Eye Care
479 Old Union Turnpike
Lancaster, MA  01523

COPY

Most Respectfully Yours,

James J. Murray

lr 8/2/02

It Has, As of Today Dr. Mahar, (Monday, July 22nd, 2002), Now Been 1 Full Week Since Your Prescribing of This Eye Medication For Me. Which, Is of The Utmost Importance For Me In Attempting To Lower The Eye Pressure In My Right Eye. And, The F.M.C Devens Health Services Department And Its Pharmacy Has Thusfar Failed To Dispense This Much Needed Medication To Me.

It Is For This Reason That I Am Writing This Letter To You Today Dr. Mahar, As I Am Aware of The Permanent Damage Which Is Being Done To My Right Eyes Optic-Nerve With Every Passing Day As A Result of The Risen Pressure In My Right Eye.

I Wish To Therefore Request of You Dr. Mahar, If You Could Please Contact The F.M.C. Devens Health Services Department, Or In Particular, Its Pharmacy In My Behalf? And, If You Could Please Convey To Them Directly Your Wishes For The Dispensing of Your Recommended Eyedrop Medication For Mr Sir?

Also, As A Footnote Dr. Mahar, Could You Please See That I Am Scheduled For My Eyes To Be Re-Examined Once Again At The D'Ambrosio Eye Clinic As Soon As Possible In Order To Monitor The Results of My New Eyedrop Medication And My Eyes Pressure? And Also, If Possible, To Undergo The 2nd Laser Surgery Procedure I May Need During This Same Appointment? As, I Do Not Wish For Any Further Damage To Occur To My Right Eyes Optic-Nerve Due To Any Time Delay, Than Has Already Occured Thusfar Dr. Mahar As A Result of The Negligence of The F.M.C. Devens Health Services Department And Its Pharmacy.

I Thank You So Very Much.
Respectfully Yours,

James J. Murray

P.S. For Your Convenience Dr. Mahar, The Telephone No.# of The F.M.C. Devens Front Desk Is: (978) 796-1000.
Also, The Telephone No. # of The F.M.C. Devens Pharmacy Directly Is: (978) 796-1560

Thank You Once Again.

COPY



D'Ambrosio Eye Care
479 Old Union Turnpike
Lancaster, MA 01523

7/24/02

# Exhibit 3

BP-S148.055 **INMATE REQUEST TO STAFF** CDFRM
SEP 98
**U.S. DEPARTMENT OF JUSTICE**                    **FEDERAL BUREAU OF PRISONS**

| TO:(Name and Title of Staff Member) A.W.H. Edward Motley | DATE: Wednesday, Sept. 18TH, 2003 |
|---|---|
| FROM: James J. Murray | REGISTER NO.: 56285-079 |
| WORK ASSIGNMENT: I-Unit Orderly | UNIT: I-Unit |

SUBJECT: (Briefly state your question or concern and the solution you are requesting. Continue on back, if necessary. Your failure to be specific may result in no action being taken. If necessary, you will be interviewed in order to successfully respond to your request.)

Dear Mr. Motley, I Respectfully Submit This Cop-Out To You Today, In Order To Ask For Your Help. I Have The Eye Disease Which Is Known As Glaucoma. Briefly Sir, Glaucoma Is Caused By An Increase of The Pressure Within Ones Eye. This Increase In Eye Pressure, Then Damages The Eyes Optic-Nerve. (Which Is Permanent & Cannot Be Repaired). With Each Day That Passes In Which The Eye Pressure Is Elevated Mr. Motley, A Person With Glaucoma (Such As Myself) Loses More And More of Their Eyesight Forever. (Over Please)

(Do not write below this line)

DISPOSITION:

US0266

Previously Sir, I First Reported My Eyesight Problem At F.M.C. Devens Camp Sick Call On May 8th, 2001. After Then Having To Wait For More Than 4½ Months, I Was Eventually Examined By The F.M.C. Devens Visiting Optometrist (Dr. Mahar) On Sept. 22nd, 2001. Dr. Mahar Immediately Diagnosed My Eye Disease And Started Me On The Eyedrop Medication: Timolol. Dr. Mahar Informed Me That I Needed To Be Taken To An Outside Hospital To Be Seen By An Ophthalmologist (Eye Surgeon) As Soon As Possible.

Next, After Having To Wait For More Than An Additional 7 Weeks, I Was Finally Taken Out To The D'Ambrosio Eye Clinic On Nov. 13th, 2001 Where My Eyes Were Examined By An Ophthalmologist (Dr. Yelen). While There, I Was Informed That I Had Glaucoma In Both Of My Eyes. And, That The Glaucoma In My Right Eye Was In An Advanced Stage. Dr. Yelen Wanted To Schedule Me For Surgery That Following Day (of 11/14/01) In Order To Alleviate The Inter-Occular Pressure Within My Right Eye Which Was Permanently Damaging My Right Eyes Optic-Nerve. Unfortunately Mr. Motley, I Wasn't Allowed To Undergo My Much Needed Eye Surgery Until 1/15/02. (Which, Was More Than 8 Months Since I Had First Reported Experiencing Eye Problems At F.M.C. Devens Camp Sick Call On May 8th, 2001).

Next, On 1/29/02, I Had A Post-Surgical Follow-Up Eye Re-Examination At The D'Ambrosio Eye Clinic With Dr. Yelen. At This Time, It Appeared That My Eye Surgery Had Been Successful, And That The Pressure Within My Right Eye Had Been Reduced To A Safe Level.

US0267

I Was Instructed By Dr. Yelen To Continue To Administer My Timolol Eyedrop Prescription In Both of My Eyes, Twice A Day. And Also, That I Was To Be Re-Examined By The F.M.C. Devens Visiting Optometrist At F.M.C. Devens Within 90 Days of 1/29/02 (By Appx. 4/29/02). And, Then Again, Within 6 Months of 1/29/02. (By Appx. 7/29/02) Back Out At D'Ambrosio Eye Clinic. (Crucial During These Follow-Up Eye Re-Examinations Mr. Motley, Was To Be An Eye Pressure Test).

Exactly 1 Week After My 1/29/02 Post-Surgical Eye Re-Examination, (On 2/5/02), I Was Personally Visited At The F.M.C. Devens Camp By Ms. Joanne Roseman, Health Services Administrator of F.M.C. Devens. During Our Conversation Mr. Motley, I Personally Informed Ms. Roseman of Dr. Yelens 2 Recommendations For The Follow-Up Re-Examinations of My Eyes, And Their Dates of: 4/29/02 & 7/29/02 Respectivly. Which, I Personally Observed Ms. Roseman Make Note of. Unfortunately Mr. Motley, My Doctor Recommended 90 Day Follow-Up Re-Examination For My Eyes Was Never Adhered To By The F.M.C. Devens Health Services Department. I Had Even Submitted A Cop-Out To Health Services Administrator Roseman Concerning This Matter. (Which, Was Never Answered).

Next, After Being Bypassed For My Recommended 90 Day Post-Surgical Eye Re-Examination, I Was Taken Back Out To The D'Ambrosio Eye Clinic On 7/15/02 For My 2ND Doctor Recommendation of: A 6 Month Post-Surgical Re-Examination of My

US0268



While There, I Was Examined By Dr. Mahar. Sadly, Dr. Mahar Informed Me That The Eye Pressure Within My Right Eye Had Once Again Risen To A Dangerous Level! Dr. Mahar Then Asked Me "When Were My Eyes Last Examined"? To Which, I Replied "On January 29th, 2002". I Informed Dr. Mahar of Dr. Yelen's Recommendations. And, of My Personal Conversation With Ms. Joanne Roseman During Which She Made Note of The Fact That My Eyes Were To Be Re-Examined By The Visiting Optometrist At F.M.C. Devens By Appx. April 29th, 2002.

Dr. Mahar Seemed Quite Taken Aback As He Asked of Me "And Nobody Looked At Your Eyes At All At Devens During This Time"? (Referring To The Period of Between January 29th, 02 - July 15th 02) To Which, I Answered "No". Immediately, I Knew That This Meant That Once Again My Right Eyes Optic-Nerve Had Been Permanently Damaged Even Further.

Dr. Mahar Then Informed Me That He Wanted To Start Me On A 2nd Eyedrop Prescription Know As: Latanoprost. Which, Was To Be Administered In Conjunction With My Previously Prescribed Eyedrop Medication of: Timolol, In Order To Attempt To Reduce The Inter-Occular Pressure In My Right Eye Which Was Permanently Damaging My Right Eyes Optic-Nerve.

Dr. Mahar Informed Me That He Would Contact The F.M.C. Devens Pharmacy And Have Them Issue Me This New Prescription of: (Latanoprost) That

US0269



After More Than 1 Week Had Passed By Mr. Motley, And I Had'nt Received This 2ND Eyedrop Medication From The F.M.C. Devens Pharmacy And The F.M.C. Devens Camp Pill Line, I Sent A Cop-Out Addressed To: The Health Services Administrator of F.M.C. Devens Informing Them of My Problem. (This Cop-Out Also, Has Never Been Answered). Finally, On The Evening of July 26TH, 2002, After 12 Consecutive Evenings of Inquiring About My Latanoprost Eyedrops, I Was Given My Much Needed Eye Medication Which Had Been Prescribed For Me On 7/15/02.

Next, On 8/5/02 I Was Taken Back Out To The D'Ambrosio Eye Clinic. My Eyes Were Once Again Administered An Eye Pressure Test By Dr. Mahar. I Was Then Informed That My New 2ND Eyedrop Medication of: Latanoprost Appeared To Be Working, And That My Eye Pressure Had Been Reduced! Dr. Mahar Then Informed Me That He Would Re-Schedule Me For Another Follow-Up Re-Examination of My Eyes In Order To Keep A Close Watch On My Eyes Pressure.

Next Mr. Motley, On 8/23/02 I Was Taken Back Out To The D'Ambrosio Eye Clinic. Where My Eyes Were Once Again Given An Eye Pressure Test By A Dr. Michael Fu. Sadly, Dr. Fu Informed Me That The Eye Pressure Within My Right Eye Had Risen Once Again To A Dangerous Level. Dr. Fu Informed Me That He Wanted To Pre-scribe A New, (3RD) Eyedrop Medication For Me.

US0270



DR. Fu Stated To Me That Although My First Two Eyedrop Medications of: Timolol & Latanoprost Are Good, That He Wanted To Prescribe A 3RD Eyedrop Medication For Me To Be Taken In Conjunction With My Other Two Eyedrop Prescriptions.

This, Thus Brings Me To The Purpose of My Writing To You Today Mr. Motley. As of Today, (Wednesday September 18TH, 2002), It Has Been Almost 4 Full Weeks (On Fri. Sept. 20TH) Since Dr. Michael Fu' Prescribing of This (3RD) Eyedrop Medication For Me. And, I Have Thusfar Failed To Receive It At The F.M.C. Devens Camp Pill Line Through The F.M.C. Devens Health Services Department, To The F.M.C. Devens Pharmacy.

I Have Submitted A Cop-Out To The Health Services Administrator of F.M.C. Devens Once Again Concerning This Matter. (However, It Also Has Never Been Answered). I Have Also Reported To F.M.C. Devens Camp Sick Call, And Personally Spoken With Physicians Assistant (MR. J. Brooks). I Supplied (P.A.) Brooks With The Telephone No. of The D'Ambrosio Eye Clinic, As Well As The Name of Dr. Michael Fu. I Requested of (P.A.) Brooks If Either He, Or One of His Superiors Could Please Call The D'Ambrosio Eye Clinic To Confirm My Prescription. I've Also Been Reporting Nightly To The F.M.C. Devens Camp Pill Line At 9:00 p.m., Inquiring About My (3RD Type of Eyedrop Medication To No Avail! Finally, Last Night Mr. Motley, After Conferring With The Pill Line Attendant (MR. Michael Halbran) He Agreed I Should Write To You

US0271

The Reason For My Great Concern Mr. Motley, Is, As I Have Mentioned Earlier, With Each Day That Passes For A Person With Glaucoma Such As Me In Which Their Eye Pressure Is Elevated Into A Dangerous Level, Our Optic-Nerves Suffer Permanent Damage And We Lose More And More Of Our Eyesight Forever.

I Have Already Lost A Great Deal Of The Eyesight In My Right Eye Unnecessarily And My Heart Is Absolutely Broken Mr. Motley. I Do Not Wish To Suffer Any More Permanent Damage. Can You Please Help Me Sir To Receive This (3RD) Eyedrop Medication Which Was Prescribed For Me On August 23RD 2002? I Thank You So Much For Any Assistance You Can Give Me Concerning This Matter Sir.

Respectfully Yours,

James J. Murray

James J. Murray

P.S. I Am Enclosing A Pamphlet On Glaucoma Which Was Given To Me At The D'Ambrosio Eye Clinic. For Your Convenience Sir, Their Telephone No. # Is On The Back Page (Leominster Location) In Case You Would Like To Call Them To Verify My Prescription By Dr. Michael Fu On 8/23/02.

Thank You Once Again.

US0272

# Exhibit 4

BP-S148.055 **INMATE REQUEST TO STAFF** CDFRM
SEP 98
**U.S. DEPARTMENT OF JUSTICE**                          **FEDERAL BUREAU OF PRISONS**

| TO: (Name and Title of Staff Member) A.W.H. Edward Motley | DATE: October 4TH, 2002 |
|---|---|
| FROM: James J. Murray | REGISTER NO.: 56285-079 |
| WORK ASSIGNMENT: I-Unit Orderly | UNIT: I-Unit (Camp) |

SUBJECT: (Briefly state your question or concern and the solution you are requesting.
Continue on back, if necessary. Your failure to be specific may result in no action being
taken. If necessary, you will be interviewed in order to successfully respond to your
request.)

Dear Mr. Motley, I Am Respectfully Submitting
This Cop-Out To You Today, In Order To Acknowledge My
Having Received (On October 3RD, 2002) Your Staff Response
To My Inmate Request Dated: September 18TH, 2002.
On September 24TH, 2002 Mr. Motley, I Finally Did
Receive The Alphagan P Eye Medication Which Had Been
Prescribed For My Glaucoma Eye Condition At The
D'Ambrosio Eye Clinic On August 23RD, 2002.
However Mr. Motley, On September 23RD, 2002, I
Was Taken Back To The D'Ambrosio Eye Clinic In Order
To Check My Right Eyes Response Towards The Alphagan P
Eye Medication Which Had Been Prescribed For Me 32 Days Earlier.

(Do not write below this line)

DISPOSITION:                                    (Over Please)———→

| Signature Staff Member | Date |
|---|---|
| | |

Record Copy - File; Copy - Inmate
(This form may be replicated via WP)

This form replaces BP-148.070 dated Oct 86
and BP-S148.070 APR 94



US0648

The Examining Doctor Seemed To Be Quite Stunned Upon Learning That I Had Not Yet Been Issued My Alphagan P Eye Medication (By September 23rd, 2002) From The F.M.C. Devens Health Services Department And, The F.M.C. Devens Pharmacy.

Subsequently, The Examining Doctor Performed An Eye Pressure Test To Both Of My Eyes. Upon Completion Of This Test, I Was Given Some Very Bad News Mr. Motley.

I Was Informed By The Doctor That The Eye Pressure Within My Right Eye (For Which, The Alphagan P Eye Medication Had Been Prescribed For) Had Elevated To A Very Dangerous Level. Thus, Causing Even Further Permanent Damage To My Right Eyes Optic-Nerve.

The Examining Doctor Then Informed Me That He Would Confer With An Eye Surgeon Right Away, In Order To Discuss The Severity Of My Eyes Condition! And, That He (The Examining Doctor) Felt As Though I Would Now Need To Have A More Invasive Type Of Surgical Eye Procedure Performed.

I Am Currently Awaiting This Major Surgical Eye Procedure Which I Must Now Undergo Mr. Motley, And I Am Absolutely Heartbroken Over The Damage Which I Have Incurred To My Right Eye & It'd Optic-Nerve So Very Very Unnecessarily.

The Purpose Of My Writing Of This Cop-Out To You Today Mr. Motley Is To Inform You Of The Current State Of My Eyes Condition. I Am Very Nervous About My Upcoming Eye Operation, And I Pray For A Safe & Successful Outcome. James J. Michael

US0649

# Exhibit 5



**D'AMBROSIO**
Eye Care ⁿᶜ

Francis A. D'Ambrosio, Jr., M.D.
Eye Physician & Surgeon

Oren L. Weisberg, M.D.
Pediatric Ophthalmologist
Adult Strabismus

*Rendering opinion mailed 12/30/04 (CH)*

December 28, 2004

Mr. James P. Duggan
Attorney at Law
160 State Street
Boston, MA 02114

RE:  JAMES MURRAY
     DOB: 2/11/56
     SSN: 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

Dear Mr. Duggan:

This is a summary of our treatment of Mr. James Murray which commenced on
November 13, 2001.

On November 13, 2001, Mr. Murray was seen for the first time in our office for
evaluation of glaucoma. The history is that he had seen an optometrist on September 24,
2001 with an elevated pressure in his right eye, and was diagnosed as having
pseudoexfoliation, and he had a large cup-to-disk ratio in the right eye. He was started on
Timolol, .5% in the right eye to be used twice a day. He stated he had been using the
drop as prescribed, and had not noticed any difficulties since starting the drops. His
examination was remarkable at the time for an elevated intraocular pressure in the right
eye of 34, and a normal pressure in the left eye at 17. He had early cataract formation in
both eyes with some pseudoexfoliation of the lenses of both eyes. His cup-to-disk
measurements were .85 in the right eye (which is large), and .35 in the left eye (which is
within the normal range). It was determined that as well as having cataracts, he had
pseudoexfoliation glaucoma, advanced in the right eye, and beginning in the left eye. It
was recommended that he continue the Timoptic in the right eye, and start Timoptic
drops in the left eye. On the same date, he had a nerve fiber layer analyzer performed
which showed some thinning of the nerve fiber layer in both eyes, slightly more in the
right eye than the left eye. He had a visual field performed in both eyes which showed
some visual field defects in the right eye more so than the left eye.

D'Ambrosio Eye Care
479 Old Union Turnpike
Lancaster, MA 01523

74 Main Street
Gardner, MA 01440-2607
TEL: 978 • 632 • 3930
FAX: 978 • 632 • 3158

479 Old Union Turnpike
Lancaster, MA 01523
TEL: 978 • 537 • 3900
FAX: 978 • 537 • 6030

100 Powder Mill Road
Acton, MA 01720-5912
TEL: 978 • 897 • 7212
FAX: 978 • 461 • 0345

Page 2
James Murray, cont.
December 28, 2004

He was seen on January 15th at which time he was still using his drops, but he had not used them the morning of the examination. His pressures were 36 in the right eye, and 10 in the left eye. It was decided that laser treatment should be done to try to bring down the pressure in the right eye. On the same day, he had laser trabeculoplasty performed on the right eye.

He was seen again on January 29th at which time he was still using the drops in both eyes, and his pressure decreased significantly to 13 in both eyes. The blood flow analyzer was performed which was essentially normal in both eyes. Due to the good reduction in pressure, it was decided that he would be seen at the Ft. Devens Clinic in three months for a pressure check, and then in six months in our office for further testing. He was to continue on the drops.

He was seen again on July 15, 2002 for glaucoma follow up. He was using the drops in both eyes twice a day as instructed, however, today his pressures were 38 in the right eye, and 14 in the left eye. There was an obvious elevation of the pressure in the right eye despite being on the drops. Visual field test was performed which showed a slightly increased visual field defect in the right eye. Nerve fiber analyzer also showed increased loss of nerve fiber in the right eye which we felt was a deterioration in his glaucoma status. He was started on another drop in the right eye called Lumigan.

He was seen again on August 5, 2002 at which time the pressure had decreased in the right eye to 18, and was 12 on the left.

He was seen on August 23rd, and his pressure was slightly increased to 22 in the right eye, and 14 in the left eye. Therefore, another eyedrop, Alphagan, was started in the right eye.

He was next seen on September 23, 2002 and despite being on Xalatan and Alphagan in the right eye, as well as Timoptic in both eyes, his pressure increased again to 37 in the right eye. At this time, I decided that drops and laser were not going to control Mr. Murray's pressures, and I recommended that he have a surgery done called a trabeculectomy/sclerectomy of the right eye.

The surgical procedure was performed on October 15, 2002, and was uneventful. Mr. Murray had the usual postop course for this type of surgical procedure. His postop course included varying drops and sometimes massages to his eye to help the success of



D'Ambrosio Eye Care
479 Old Union Turnpike
Lancaster, MA 01523

Page 3
James Murray, cont.
December 28, 2004

the surgery. He was seen very frequently over the next several months. On his
November 13th visit, he thought things were stable, and stated he was compliant with all
his drops, and still doing digital massage of the eye. At that point, he was on Pred Forte
in the right eye twice a day, and Timoptic and Alphagan in the right eye twice a day. His
pressure was elevated to 26, but the surgical site was healing well.

However, by December 9th, I felt that the pressure was not significantly low enough, and
decided that I wanted to operate again to re-open up the drainage area that was created on
the previous surgical procedure. Therefore, on December 17, 2002, I performed a
revision of the bleb of the right eye. The surgery went well, and in the early postop
period, the pressure remained low, and Mr. Murray was on varying drops to help with the
healing process and his pressure.

He was seen frequently following that, and his pressure started to elevate as we changed
around the drops and worked with digital massage, all of which was normal postoperative
care for this type of surgical procedure.

On January 29, 2003, his pressure was elevated to 31 in the right eye, but was
controllable with changing of the drops, and with the digital massage.

At this point in time, Mr. Murray was lost to follow up. Despite sending letters to Ft.
Devens, he was not seen back in our office until September 11, 2004. He had apparently
been seen by the Boston VA and, continuing on the protocol I had started, his pressure
now was 12 in the right eye, and 14 on the left which are very acceptable pressures.

Every time that he was seen in our office, there had not been an issue of drop compliance.
There was a short period of time in the fall of 2002 that we were changing drops, and
apparently it was taking some time for Ft. Devens to get the drops to the pharmacy and
then to him. However, in no way did that short period of time at all affect the
development, progression or outcome of his glaucoma.

There was a note in our telephone note section in his record that I know you are aware of.
This note was on October 17, 2002 at 10:40 a.m. At that time, the physician's assistant
from Devens called and spoke to one of my technicians. They thought that there was a
lapse of nine months before Mr. Murray was seen in our office which they felt should
have been avoided. From the time that we saw Mr. Murray on November 13, 2001 until
January 29, 2003, all of his visits were kept except for extenuating circumstances, and at

COPY

D'Ambrosio Eye Care
479 Old Union Turnpike
Lancaster, MA 01523

Page 4
James Murray, cont.
December 28, 2004

no time in the office did he state that he was not getting his drops. He had sent several long, detailed, letters to two of the physicians in my office with some complaint of not receiving his drops on time. We addressed those issues and they were quickly, by his own admission, corrected. Again, however, these were of short duration and in my professional estimation, did not in any way adversely affect the outcome of his glaucoma.

This is a type of glaucoma which is genetic in nature. Pseudoexfoliation glaucoma develops slowly and ultimately leads to very high pressures. During the development of this, the patient does not know they have glaucoma, and it must be picked up on eye examination. By looking back in the record, I do note that the first time the condition of pseudoexfoliation glaucoma was picked up was on September 24, 2001. The patient presented complaining of blurred vision in the right eye since the spring. At that point, it was determined that he had advanced pseudoexfoliation glaucoma. I do know that the request for that examination was made on May 22, 2001. Therefore, there was a delay from May 22, 2001 until September 24, 2001 when the condition was diagnosed, treatment was begun, and he was sent over to my care. I do not know if the glaucoma had started earlier than that as there is no record of any eye examinations prior to that.

Currently, Mr. Murray is supposed to be seen in Boston every 3-4 months, and to be seen in our office every 4-6 months for follow up of his glaucoma.

Sincerely,

Francis D'Ambrosio, Jr., M.D.

FAD/kc

COPY



D'Ambrosio Eye Care
479 Old Union Turnpike
Lancaster, MA 01523